Filed 4/28/26  P. v. Hernandez CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR ANTHONY HERNANDEZ,<br><br>    Defendant and Appellant. | G064398<br><br>(Super. Ct. No. 19WF1374)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lance P. Jensen, Judge. Affirmed.

Ricardo A. Nicol, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

Appellant Victor Anthony Hernandez was convicted of multiple counts of sexual crimes against a 14-year-old child. On appeal, Hernandez raises the following claims of error: (1) the trial court improperly limited his right to cross-examination by excluding evidence related to impeachment of the victim's mother; (2) the court improperly excluded evidence of the victim's mother's conduct, which was relevant to demonstrate her bias; (3) the prosecution committed misconduct by failing to correct the victim's mother's alleged false testimony; (4) the court should have granted his motion for mistrial based on the prosecution's misconduct; (5) the court improperly denied his request to recall various defense witnesses; and (6) the verdict statements are misstatements of the law. We disagree and affirm the judgment.

FACTS

*A.  Factual Background*

1.  Prosecution Evidence

In December 2018, W.O. (mother) had separated from her husband and needed to move out of their shared home. Mother had two children, a 14-year-old son (victim) and a 16-year-old daughter (daughter). Hernandez, who owned a truck and trailer and had been friends with mother for about six months, agreed to help her move. Hernandez's friend Ernesto also agreed to help, as did victim's 14-year-old friend P.P. and daughter's boyfriend C.N.

On moving day, the group made several trips between the house and mothers storage unit. Everyone, including the children, were drinking champagne, although mother did not know her underage children were drinking.

2

Mother left around 7:00 p.m. to attend a work event. Hernandez and Ernesto agreed to stay at the house until mother returned. Hernandez had met mother's children once before. P.P. and C.N. stayed as well. Mother called to check in and was assured everything was fine.

Hernandez and Ernesto drove with victim to the liquor store and bought large amounts of alcohol. Hernandez poured alcohol into shot glasses and gave them to victim and P.P. Hernandez, Ernesto, victim, and P.P. hung out downstairs while daughter and C.N. stayed upstairs in her bedroom. Victim, who had never had alcohol before, consumed approximately eight to 12 drinks and became drunk.

Later in the evening, Hernandez was talking separately with victim in the living room. Hernandez asked victim whether he had ever kissed or had sexual intercourse before. Hernandez repeatedly stroked victim's arm and hugged him. Victim was confused and uncomfortable but did not tell anyone or try to stop it.

Hernandez and Ernesto later danced in front of victim and P.P. in a sexually suggestive manner. Hernandez and Ernesto started talking about penises and asked victim about the size of his penis.

Hernandez then said he was going to the bathroom and asked victim to meet him in the office across from the bathroom. Victim followed Hernandez down the hall, and Hernandez pushed victim into the office. Hernandez closed and locked the door.

Hernandez then got on his knees and pulled down victim's pants. Victim was swaying because he was intoxicated, and Hernandez held him steady by gripping victim's hips. Without asking permission, Hernandez began orally copulating victim. Victim had not agreed to engage in oral copulation and felt confused, and that he could not leave.

3

Hernandez then stood up, faced the wall, pulled down his own pants, and guided victim's penis into his anus. Victim did not try to stop him, although victim did not want to engage in sex with Hernandez and did not feel that he could leave. Hernandez then resumed orally copulating victim until victim ejaculated. Hernandez told victim not to tell anyone. Victim pulled up his pants and left the office.

P.P. had noticed victim and Hernandez were missing and looked for them upstairs. When victim returned, P.P. noticed that his behavior "was off" and that he looked "a little shook up." Hernandez returned to the living room shortly after victim and was talking on the phone.

Victim told P.P. that he and Hernandez had sex and that he had lost his virginity. Victim felt confused, nervous, and disgusted with himself. At this point, victim was very intoxicated, experiencing dizziness, lightheadedness, blurred vision, and difficulty walking or standing. P.P. blew up an air mattress to lie down.

Mother returned home around 10:00 p.m. and found Hernandez and Ernesto in the kitchen. She saw numerous empty bottles of alcohol in the kitchen that were not there when she left. Victim and P.P. were asleep on an air mattress downstairs. After mother woke them up to go upstairs, she was upset because she suspected they had been drinking. Mother left with Hernandez and Ernesto to go to her friend's house.

Daughter woke up around the time her mother left with Hernandez and Ernesto. Daughter saw P.P. throwing up in the upstairs bathroom. Victim called for her, and daughter went to help him. When daughter asked victim if he was okay, he started crying. She believed victim was drunk because he was slurring his words and mumbling. Victim told daughter that Hernandez did "stuff" to him and that his "butt hurt." He kept

asking, "'What's wrong with me? What happened?'" Victim asked daughter if this was how he lost his virginity.

Daughter called her mother, saying, "'[Hernandez] did something to your son, and you need to get home immediately.'" Daughter also said, "'I think he touched him sexually, something happened.'"

When mother confronted Hernandez, asking him what he had done to victim, Hernandez replied, "'Your son is on a journey,'" and "'Your son is curious.'" Mother was furious at Hernandez, stating, "'He's a child. He's 14 years old. What did you do to my son?'" Although Hernandez did not say what he had done to victim, he did state "[t]hat he fucked up" and that he would take whatever was coming to him.

Mother felt that her trust was betrayed and that she had failed her children. After mother returned home, victim told her, "'I'm so sorry, Mom.'" She hugged him and asked him to tell her what happened. Victim told mother what happened while he was sobbing and curled up in a fetal position.

Early the next morning, Hernandez sent mother the following text: "'I have nothing but shame, remorse, and regret for everything. I'm sorry, [W.O.], for what went down and breaking our trust. I feel wrong inside for everything, and I can never feel clean and I can never be okay now. This is a stain and will haunt me. I'm really sorry and I don't know how to proceed from here. I guess all I can say is I'm sorry, I love you and goodbye.'"

Mother called police, who interviewed victim regarding his interactions with Hernandez. Victim appeared scared and hesitant and cried during the conversation. Victim said that he did not go into the office willingly but was pushed by Hernandez.

5

Victim was examined later that day by a forensic nurse, who collected swabs to test for DNA. Hernandez's DNA profile matched that found on victim's penial and scrotal samples. The testing also revealed amylase in both the penial and scrotal samples, indicating the presence of saliva.

2. Defense Evidence

Hernandez's mother, sister, and friends testified that Hernandez had a serious drinking problem and would routinely drink until he passed out.

Hernandez testified in his own defense: He routinely bought a gallon of hard alcohol on the weekends and drank until he passed out. He had a sexual relationship with Ernesto, had had sex with mother, and had engaged in a threesome with mother and his friend Tommy.

Hernandez was drunk and fell asleep in the office at mother's house. He woke up to find victim lying on top of him and anally penetrating him. Hernandez decided not to tell anyone what happened because he did not want to ruin victim's life. He admitted sending the text message to mother but did so to take the blame for victim. He acknowledged that sex with a minor is illegal, he felt he was to blame, and he should not have gotten so intoxicated.

On cross-examination, Hernandez admitted the following: he had anal sex with victim, his DNA was on victim's penis, he spoke with victim about penis size, he stroked victim's arm, and he knew victim was a teenager.

B. *Procedural History*

Hernandez was charged with committing a lewd act on a minor 14 years old and at least 10 years younger than the defendant (Pen. Code,[1]

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

288, subd. (c)(1); count 1), oral copulation of a minor under 16 by a person over 21 (§ 288, subd. (b)(2); count 2), sodomy of a person under 16 by a person over 21 (§ 286, subd. (b)(2); count 3), forcible oral copulation on a minor 14 or older (§ 288a, subd. (c)(2)(C); count 4), forcible sodomy of a minor 14 or older (§ 286, subd. (c)(2)(C); count 5), and contributing to the delinquency of a minor (§ 272, subd. (a)(1); count 6).

The information alleged the following aggravating factors: the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)); Hernandez induced others to participate in the commission of the crime (rule 4.421(a)(4)); he induced a minor to commit and assist in the commission of the crimes (rule 4.421(a)(5)); and he took advantage of a position of trust to commit the crimes (rule 4.421(a)(11)). The prosecution eventually dismissed count 6 and two of the aggravating factors, i.e., that Hernandez induced others to participate in the crime and he induced a minor to commit and to assist in the commission of the crimes.

The jury convicted Hernandez of counts 1 through 5 and found true the aggravating factors as to each count. The trial court sentenced Hernandez to a total term of 17 years and eight months in prison, consisting of the middle term of nine years on count 5, a consecutive middle term of eight years on count 4, and a consecutive term of eight months on count 1. The court stayed the sentence on counts 2 and 3 pursuant to section 654.

## DISCUSSION

### I.

### CROSS-EXAMINATION OF VICTIM'S MOTHER

Hernandez contends the trial court improperly limited his right to confront mother regarding a video allegedly depicting her engaged in a threesome with Hernandez and Tommy. Hernandez argues that mother lied

7

when she denied having had sexual intercourse with him and that the exclusion of the video gave mother a false aura of credibility. We conclude any error was harmless given the substantial evidence of his guilt.

A. *Factual Background*

Defense counsel asked mother on cross-examination whether she knew there was a video of her, Tommy, and Hernandez. After the trial court overruled the prosecutor's objection, defense counsel asked, "Are you aware of a video, ma'am?" Mother replied, "No." Later, the following colloquy occurred:

"[Defense Counsel]: You didn't know Victor that well, correct?

"[Mother]: Correct.

"[Defense Counsel]: And I'm sorry to ask, but you knew him sexually, correct?"

The court sustained the prosecutor's objection on relevance grounds.

Defense counsel then requested a sidebar. The court paused proceedings and called both parties into chambers. Defense counsel stated that he had a video depicting Hernandez, Tommy, and mother having a threesome sometime before the charged offenses. When the court asked how the video was relevant, defense counsel argued that mother was misrepresenting Tommy as Hernandez's boyfriend for the following reasons: "[T]hey specifically told the kids that Tommy was the boyfriend to explain why . . . Tommy and Hernandez and [mother] would go into her bedroom, to suggest that they are not doing anything. It's just these two guys that are friends, that's why they are all in there. The idea is she was making cover for her own tryst that she was doing. The point—so the relationships—if the prosecutor hasn't gotten into the relationships, because she is trying to prove this trust, this great relationship she had with Hernandez when in fact she is lying about the whole situation."

8

The prosecutor objected on the ground that the video was irrelevant and prejudicial: "The relationships, sexual relationships, if any, between the mother of the victim, Tommy, and [Hernandez] is not relevant to whether or not [Hernandez] sexually assaulted the minor. An adult relationship, whether it exists or not, is not relevant to the conduct at hand, first. And, second, a sex video of the victim's mother is highly prejudicial, way more prejudicial than probative."

The trial court excluded the video as more prejudicial than probative under Evidence Code section 352. However, the court stated it would allow defense counsel to ask mother "whether or not she has had a sexual relationship with Tommy." Further, the court stated it would allow defense counsel to impeach mother if she testified that she did not have a sexual relationship with Tommy but not with evidence of the video.

Defense counsel asked mother whether she had a "sexual relationship with Tommy," to which mother replied, "No." Defense counsel then queried, "Are you saying you never had a [threesome] with Tommy and my client?" Mother replied, "No." Later, defense counsel asked, "And did you ever tell [victim] or [daughter] that Tommy was Victor's boyfriend to hide the fact that you were going to have a [threesome]?" Mother replied, "I do remember [saying] something saying, yes, that they were a couple, but that's it."

After dismissing the jury, the trial court stated that questions about Tommy and Hernandez visiting mother's house were not relevant because it occurred before the move and it would necessitate undue consumption of time. The court requested defense counsel provide a copy of the video so the court could make an informed decision if the issue arose again.

Defense counsel stated he had several reasons that he wanted to ask mother about the video, including to demonstrate that mother lied when she denied a sexual relationship with Hernandez and denied knowledge of the video. Also, because the prosecution had alleged mother trusted Hernandez to be with her children, the defense wanted to demonstrate there was no relationship between the two, only sex. Therefore, mother "d[id]n't have a right to say 'I'm a great mom, look at me,' when in fact, that was just a bad decision" for her to leave the children with Hernandez. Additionally, defense counsel wanted to establish that Ernesto was Hernandez's boyfriend to argue that Hernandez would not have had sex with victim with Ernesto present.

Defense counsel stated he did not want to show the video to the jury but rather wanted to impeach mother with it. The trial court responded that it was not preventing the defense from impeaching mother but that it was not going to allow impeachment using the video.

The video came up again after the prosecution rested its case. Defense counsel stated he planned to call Tommy as a "habit and custom" witness and "that also deals with that one video." The trial court stated it had since watched the video but that it remained "inadmissible and not an area of inquiry." The following exchange then occurred:

"[Defense Counsel]: So I can't ask if the video existed?

"[Court]: I thought my ruling was clear. My ruling is clear, that is not a topic upon which we are going to address—

"[Defense Counsel]: Yeah, I'm just defining.

"[Court]: —Period.

"[Defense Counsel]: The video—

"[Court]: The video, the [threesome], the pictures, anything about that. The court has ruled on that. [¶] Is there anything unclear about the court's ruling in regards to that area that I can assist you with?

"[Defense Counsel]: Yes.

"[Court]: What is that, sir?

"[Defense Counsel]: Well, [mother] identified [Tommy] as a boyfriend, and he's not a boyfriend.

"[Court]: Okay. That's how—okay. So that's how she introduced them. Okay.

"[Defense Counsel]: And I want to refute that, and I wanted to establish what the true relationship is.

"[Court]: Between [Tommy] and your client, great, ask him what relationship he has with your client.

"[Defense Counsel]: And her.

"[Court]: No. [Defense counsel], again, I don't know how clear the court can be on this topic. This video, [threesomes], sport sex, everything that we have talked about ad nauseum and I have heard from both of you, the court has ruled. So we are not getting into it."

The trial court stated it was willing to reconsider its ruling if defense counsel could demonstrate something had changed. Defense counsel argued that one of the elements the prosecution had to prove was that Hernandez took advantage of a position of trust, but that Hernandez was never put in a position of trust because his relationship with mother only involved casual sex. The court denied the request to reconsider its ruling.

The defense called Tommy as a witness, who testified that he knew Mother but did not know her last name. Defense counsel did not ask Tommy any further questions about mother.

11

Hernandez testified that Ernesto was "more than a friend." He also testified that he and Tommy had threesomes together. When asked whether he could recall meeting mother in person on other occasions, Hernandez stated, "So there was her birthday and then from her birthday, then there was the time where we all had our sexual endeavors with—." The prosecution objected and the court called the parties into chambers.

The trial court brought up the subject of the video, noting it seemed to show two different incidents and that mother, Hernandez and Tommy appeared to be participants. The court queried whether defense counsel was "seeking to impeach [mother] by virtue of having your client right now say he had a sexual experience with her?" Defense counsel answered yes and noted that this would be directly contrary to mother's testimony.

The trial court then modified its earlier ruling: "In light of the testimony of [mother] denying any type of relationship and denying the existence of a video, I'm inclined to allow counsel to ask one or two questions along these lines because he has alluded to it already—even though the court has stricken it—and that would be at any time prior to the date of violation, and I think you have indicated, counsel, two months prior to the date of violation, 'did you engage in a sexual [threesome]' however you want to describe it, 'involving you, Tommy, and [mother]?' 'Yes.' 'Thank you.' That would go directly towards impeaching [mother] as to her testimony, but we are still not going to get into a video."

The prosecutor objected to any questions about mother having sex with Hernandez or Tommy months before the alleged crimes because it was not relevant to Hernandez's acts involving victim. The prosecutor further argued that any evidence regarding mother's alleged sex acts would simply

12

confuse the issues and should therefore be excluded under Evidence Code section 352.

The trial court allowed defense counsel to "simply ask [his] client as to whether or not he had a prior sexual experience with [mother] and anticipating his answer is going to be yes, [defense counsel] could ask him when it was and [defense counsel] ha[s] indicated two months prior to this date of violation and then we can move on." The court denied defense counsel's requests to ask Hernandez whether his sexual encounters with mother were videotaped and if there was "proof" of the sex. The court further encouraged defense counsel to use leading questions to prevent Hernandez from mentioning the video.

Hernandez then testified he had sexual relations with mother and Tommy at her home approximately three months before the charged crimes.

## B. Legal Standard

The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) A defendant's right to cross-examine an adverse witness with impeachment evidence is a vital constitutional right. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678–679 (*Van Arsdall*).) The Supreme Court has held that a violation of the confrontation clause occurs when a defendant is barred "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" (*Id.* at p. 680.)

13

However, trial courts "retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." (*Van Arsdall*, *supra*, 475 U.S. at p. 679.) "[N]otwithstanding the confrontation clause, a trial court may restrict cross-examination [pertaining to the credibility] of an adverse witness on the grounds stated in Evidence Code section 352." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.)

"Proper application of *Van Arsdall* requires threshold consideration of whether the trial court exercised sound discretion under state law evidentiary standards in limiting the scope of cross-examination." (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1282 (*Castaneda-Prado*). Whether the court exercised its discretion to impose reasonable limits on cross-examination under the Evidence Code is determined "under the deferential abuse of discretion standard of review governing such discretionary questions." (*Ibid.*) If the court excluded "evidence of marginal impeachment value" (*People v. Brown* (2003) 31 Cal.4th 518, 545) or "otherwise merely carried out the routine evidentiary function of controlling the scope of permissible cross-examination, the answer to this initial evidence question will generally be yes—the trial court was within its discretion—and the inquiry comes to an end." (*Castenada-Prado*, *supra*, at p. 1282.)

However, where a trial court effectively renders cross-examination an exercise in futility, we must proceed to a second stage of analysis. Here, we ask whether "[a] reasonable jury might have received a significantly different impression" of the challenged witness's credibility if the proposed line of cross-examination had been permitted. (*Van Arsdall*,

14

*supra*, 475 U.S. at p. 680.) This is determined by applying a de novo standard of review. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1283.)

"'[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other [c]onfrontation [c]lause errors, is subject to *Chapman* harmless-error analysis.' (*Van Arsdall*, *supra*, 475 U.S. at p. 684, citing *Chapman v. California* [(1967)] 386 U.S. 18, 24 [(*Chapman*)].) 'The correct inquiry,' [therefore,] 'is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.'" (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1281.) Whether a particular confrontation clause violation is harmless "'depends upon a host of factors,' including 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case.'" (*Ibid.*)

*C. Discussion*

On the record before us, it is a close call whether there was a confrontation clause violation under *Van Arsdall*. On the one hand, the trial court could reasonably have restricted the defense from pursuing the threesome line of questioning altogether on the ground that its probative value was substantially outweighed by the probability that it would necessitate undue consumption of time and create danger of undue prejudice under Evidence Code section 352. On the other hand, once the court allowed the defense to ask mother about the threesome and she denied it, the video gained impeachment value and became more probative.

Nevertheless, we conclude any error was harmless beyond a reasonable doubt under *Chapman*. (*Van Arsdall*, *supra*, 475 U.S. at p. 684.) As noted, whether a particular confrontation clause violation is harmless depends on "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." (*Ibid.*)

Here, mother was not a particularly important witness in the prosecution's case because she was not present at the time of the crimes and victim himself testified that Hernandez sexually abused him. Her testimony was cumulative of victim's because she primarily relayed what he told her about the sexual assault. Victim also told his sister and friend P.P. about the sexual abuse directly after it happened, and both testified to their conversations with victim. Additionally, the trial court allowed defense counsel to cross-examine mother regarding whether she had sex with Hernandez and Tommy, as well as on a variety of other matters relating to her credibility, such as her decisions to allow her minor children to drink alcohol and to leave them in Hernandez's care.

Furthermore, the prosecution's case was overwhelming: victim testified that Hernandez sexually assaulted him and that he did not consent; daughter and P.P. testified that victim told them about the assault almost immediately after it occurred; Hernandez's DNA profile matched that recovered from victim's genital area; and Hernandez sent mother a text message the following morning apologizing and saying that everything was his fault. Thus, even if the trial court had allowed cross-examination

16

regarding the video, it is not reasonably likely the outcome would have been different given the strength of the prosecution's case.

## II.

### EVIDENCE OF VICTIM'S MOTHER'S ALLEGED BIAS

Hernandez also argues the trial court erred by excluding the video because it was relevant to demonstrate mother's bias against him based on the fact they had a prior sexual relationship.

The Supreme Court has "'recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" (*Van Arsdall*, *supra*, 475 U.S. at pp. 678–679.) "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." (*United States v. Abel* (1984) 469 U.S. 45, 52.)

Hernandez offers no explanation as to how the fact he and mother had sexual relations would demonstrate her bias, nor offers any citation to the record in support of this argument. "Appellate courts presume the trial court's judgment or order is correct and indulge all intendments and presumptions to support the judgment or order on matters as to which the record is silent. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) A logical implication of the presumption of correctness is that the appellant bears the burden of affirmatively demonstrating error." (*Eagle Fire & Water Restoration, Inc. v. City of Dinuba* (2024) 102 Cal.App.5th 448, 470.)

Even if Hernandez had explained how their past sexual relationship demonstrated mother's alleged bias, any error in excluding the

17

video itself or in excluding questioning regarding it was harmless for the reasons discussed above. Accordingly, we reject Hernandez's claim of error.

III.

PROSECUTORIAL MISCONDUCT

Hernandez contends the prosecution committed misconduct by failing to correct mother's false testimony that she had not had sexual relations with Hernandez and Tommy, citing *Napue v. Illinois* (1959) 360 U.S. 264 (*Napue*). We disagree.

*A. Legal Standard*

"""""A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citation.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""""" (*People v. Ayala* (2000) 23 Cal.4th 225, 283–284.)

"Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted." (*People v. Seaton* (2001) 26 Cal.4th 598, 647.) This principle also applies even where the false testimony "goes only to the credibility of the witness." (*Napue, supra*, 360 U.S. at p. 269.) The elements of a *Napue* claim are that "'the testimony or evidence in question must have been false or misleading' and, 'the State must have known or should have known that it was false or misleading,' and 'the testimony or evidence in question must be material.'" (*In re Hill* (2024) 104 Cal.App.5th 804, 834.)

18

*B. Discussion*

Hernandez has failed to establish a violation of his right to due process under *Napue*. Even if mother's testimony that she did not have a threesome with Hernandez and Tommy were untrue, it is not clear the prosecutor knew or should have known this was false. The prosecutor never saw the video of the alleged threesome; it was only viewed by the trial court and defense counsel. Although the court concluded mother was one of the participants after viewing the video, this only occurred after the prosecution had already rested its case.

Moreover, the jury was made aware, through Hernandez's testimony, that he had a threesome with Tommy and mother, which directly contradicted mother's testimony. The prosecutor did not object to defense counsel's questioning Hernandez about the threesome and whether he had past sexual relations with mother.

Nor did the prosecutor rely upon mother's alleged false testimony to obtain Hernandez's conviction. In fact, the prosecutor acknowledged to the jury in closing argument that mother made some poor choices as a parent, noting "[t]his is not a trial about [mother's] parenting and her decisions." And, as discussed above, mother's testimony was not essential to the prosecution's case. Rather, Hernandez's conviction was based primarily upon victim's testimony, the DNA evidence, and Hernandez's inculpatory text message. Accordingly, Hernandez has failed to demonstrate prosecutorial misconduct.

IV.

MOTION FOR MISTRIAL

When the prosecutor moved to admit evidence of Hernandez's prior conviction for possession of a firearm, the trial court ruled that only the

fact of the conviction was admissible. After the prosecutor asked about the facts underlying the conviction, defense counsel sought a mistrial, which was denied by the court. Hernandez argues the court erred in failing to declare a mistrial based on the prosecution's misconduct. We conclude the court did not abuse its discretion in denying Hernandez's motion.

A. *Factual Background*

In April 2023, Hernandez was charged with assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) and discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a)) but pled guilty to one count of possession of a firearm in violation of a court order (§ 29825, subd. (a)). The conviction was based upon violation of a protective order in the instant case. Hernandez was sentenced to 120 days in jail for the offense, which is a crime of moral turpitude.

The prosecutor moved to admit evidence of Hernandez's felony firearm possession conviction as impeachment evidence if he testified. The trial court ruled the conviction was admissible as impeachment evidence, but that Hernandez could not be asked about the underlying facts of the conviction.

During recross examination, the prosecutor asked Hernandez, "Sir, isn't it true that you as recently as April 2023, have a felony conviction for a felony possession of a firearm by a person who is prohibited by a protective order?" Hernandez replied, "Yes." The prosecutor did not ask any further questions at that time.

On redirect examination, defense counsel asked Hernandez to identify two no-contact protective court orders issued in this case, one from 2019 and the other from 2021. Hernandez noted that only the 2021 order prohibited possession of a firearm. Defense counsel then asked, "And it was

20

on the basis of that order where it said you shouldn't possess a firearm that you got arrested and you entered a felony guilty plea to possessing a firearm in violation of that order?" Hernandez answered, "Yes."

The prosecutor followed up this questioning on recross:

"[Prosecutor]: Sir, you, by court order, were not allowed to have firearms, right? [¶] . . . [¶]

"[Hernandez]: Initially, no.

"[Prosecutor]: And in late 2022, you were arrested for discharging that firearm?"

Defense counsel objected and the trial court overruled the objection "as phrased." Before Hernandez could answer, defense counsel again objected and the court called counsel into chambers.

"[Court]: All right. [Prosecutor], by [defense counsel] marking as two court exhibits two protective orders and, therefore, placing them into play and opening the door, how far do you think that you want to go in now that the door has been swung open?

"[Prosecutor]: Your Honor, just that he was arrested for this and he ultimately pled guilty, sentenced. I didn't want to go—

"[Court]: There you go, [defense counsel]. Any objection to her following up on the fact that he pled guilty to possessing a firearm in violation of a protective order?

"[Defense counsel]: I have no problem with that, but she just said he was arrested for shooting or discharging a firearm.

"[Court]: Is that true?

"[Prosecutor]: That was the charge.

"[Court]: That's the charge.

21

"[Defense counsel]: That was not the charge that he got convicted for.

"[Court]: Well, okay. [Prosecutor], you're basing this knowledge of discharge versus possession based on what?

"[Prosecutor]: Your Honor, I have his rap sheet which indicated he was arrested for negligent discharge, [section] 245[,] [subdivision] (a)(1), as well as the possession of the firearm. A case was filed in San Bernardino. He ultimately pled guilty to the singular charge.

"[Court]: Of possession?

"[Prosecutor]: Of possession. Three charges were filed.

"[Court]: Then let's keep it to possession rather than discharge. Although he may have been arrested for discharge, he pled guilty to possession, so just be mindful of that, and I think she will do that.

"[Defense counsel]: The court specifically sanitized that to the specific charge.

"[Court]: Yeah.

"[Defense counsel]: She just went beyond that.

"[Court]: No problem at all. Anything further, folks?"

Defense counsel then moved for a mistrial, arguing, "There is a specific court order exactly what she could get into and not. She went beyond that to a mere arrest that was not followed up for a conviction of a charge— well, for an arrest for a charge he was not convicted of when there is a clear order not to get into that area, and it is extremely prejudicial to make this mere allegation of what he was arrested for when she had no belief that that was what the conviction was for." The prosecutor responded, "Counsel opened the door on his redirect. Submit on that."

After denying the motion for mistrial, the court asked defense counsel if he would like the court to "admonish the jury not to consider the question that was made?" Defense counsel asked the court "to admonish the jury to disregard the District Attorney's question. It has no evidentiary value." The court then instructed the jury, "As you have been or will be instructed, ladies and gentlemen, nothing that the attorneys say is evidence. Their remarks are not evidence and their questions are not evidence. Only the witnesses' answers are evidence."

B. *Legal Standard*

Under California law, a prosecutor commits misconduct when he or she uses """"deceptive or reprehensible methods to attempt to persuade either the court or the jury.""""" (*People v. Earp* (1999) 20 Cal.4th 826, 858.) A prosecutor may commit misconduct by "eliciting or attempting to elicit inadmissible evidence" in defiance of a court order. (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Whether to grant a mistrial "is directed to the sound discretion of the trial court." (*People v. Jenkins* (2000) 22 Cal.4th 900, 985.) "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) In reviewing a ruling on a motion for mistrial, we apply "the deferential abuse of discretion standard." (*Ibid.*)

C. *Discussion*

Here, the trial court did not abuse its discretion in denying Hernandez's motion for a mistrial. First, it is not clear that the prosecutor intentionally attempted to elicit inadmissible evidence in defiance of the

23

court's order. From the evidence before us, it appears the prosecutor believed that Hernandez had opened the door to further questioning on the prior conviction by testifying that only one of the two protective orders issued in the case specifically prohibited possession of a firearm, inferring that his conviction was the result of an honest mistake.

However, even if the prosecutor committed misconduct by questioning Hernandez about the underlying facts of his conviction, any possible prejudice was cured by the trial court's instruction that the jury could not consider anything the attorneys said as evidence. In the absence of any contrary evidence, we must presume the jury followed the court's instructions. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30 (*Chhoun*).)

Moreover, there was no prejudice because the trial court sustained defense counsel's objection and Hernandez was therefore not required to answer the question regarding the facts underlying his gun possession conviction. "A party generally is not prejudiced by a question to which an objection has been sustained." (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236; *People v. Dykes* (2009) 46 Cal.4th 731, 764 [holding that "because the trial court sustained objections to the argumentative element of the prosecutor's questioning, we assume any prejudice was abated"].)

Even if the trial court erred in denying the motion for mistrial, any error was harmless. (See *People v. Welch* (1999) 20 Cal.4th 701, 749–750 & fn. 9 [finding any error in denying mistrial motion based on inadmissible reference to defendant as a drug dealer was harmless under either *People v. Watson* (1956) 46 Cal.2d 818, 836 for state error, or *Chapman*, [*supra*,] 386 U.S. at p. 24 for federal constitutional error]; see also *People v. Harris* (1994) 22 Cal.App.4th 1575, 1581 [any error in denying motion for mistrial was

harmless where "evidence of [defendant's] guilt was overwhelming"].) Here, the evidence of Hernandez's guilt, including victim's testimony, DNA evidence, and Hernandez's text message to mother, was overwhelming, and any error was therefore harmless.

V.

MOTION TO RECALL WITNESSES

Hernandez argues the trial court abused its discretion and denied him his constitutional right to present a defense by denying his request to recall witnesses Tommy, mother, and Officer Lamas. Hernandez contends he should have been able to recall these witnesses because the defense had not yet rested its case. We conclude the court did not abuse its discretion in denying Hernandez's request to recall witnesses.

A. *Factual Background*

After the defense called Tommy as a witness, and he was cross-examined, the trial court inquired whether the witness could be excused and if so, should the witness be subject to recall. Defense counsel stated there was no need for recall and the court dismissed Tommy.

The next day, defense counsel stated he wished to recall Tommy "because [he] forgot to ask him about what he saw that day during the event." The trial court replied, "[T]he process of recalling a witness is not because you forgot to ask them something. It is not because you looked through your notes and/or ordered transcripts and realized you forgot to do something. It is to address items that additional subsequent evidence has brought up. Otherwise, we are re-trying the whole case." As an example, the court noted it granted defense counsel's request to recall [victim] as a witness to address "areas that . . . Officer Lamas brought up in regards to the exchange in the

25

hallway as to how [victim] got into the room, whether it was by force or otherwise."

Defense counsel explained that he wanted to ask Tommy what time he arrived at mother's house, when he left, and what he saw. The prosecution objected on the ground that defense counsel had the opportunity to ask Tommy those questions when he called him as a witness. The trial court denied the request, noting what defense counsel "proffered in the offer of proof does not warrant . . . calling him back."

Defense counsel then sought to recall Officer Lamas to impeach daughter's testimony with an earlier statement she made to Officer Lamas. Defense counsel said, "[daughter] stated on the stand that she quoted [victim] saying, 'Is this how I lose my virginity' or words to that effect." Defense counsel explained that daughter's trial testimony suggested victim made the statement in a sad manner but her earlier statement to Officer Lamas was "as-a-matter-of-fact statement." The trial court replied, "I don't understand the impeachment because it sounds like it is the same statement." The court denied the motion to recall daughter because the proposed recall testimony was not relevant and defense counsel could have raised this issue when he originally examined daughter.

Defense counsel then asked whether "the court is staying with its initial ruling on cross-examining [mother] related to her relationship with my client, with Tommy [], and whether or not it was a sexual relationship or casual sexual relationship versus something different." The trial court confirmed the request to question mother on this topic was denied.

## B. *Legal Standard*

"A witness once examined cannot be reexamined as to the same matter without leave of the court, but he may be reexamined as to any new

matter upon which he has been examined by another party to the action. Leave may be granted or withheld in the court's discretion." (Evid. Code, § 774.) "After a witness has been excused from giving further testimony in the action, he cannot be recalled without leave of the court. Leave may be granted or withheld in the court's discretion." (Evid. Code, § 778.)

We review a court's decision declining to recall a witness for abuse of discretion. (*People v. Thomas* (1992) 2 Cal.4th 489, 542.) A trial court may permit a witness to be recalled when recall would clarify inconsistencies in the witness's testimony. (*Ibid.*) However, a trial court may refuse to allow recall of a witness if further examination "would necessarily be cumulative and repetitious of matters already inquired into." (*People v. Flynn* (1958) 166 Cal.App.2d 501, 512.) "'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.'" (*People v. Jones* (1998) 17 Cal.4th 279, 305.)

C. *Discussion*

The trial court did not abuse its discretion in refusing to allow recall of Tommy, Officer Lamas, or mother. With respect to recalling Tommy or Officer Lamas, defense counsel had the opportunity to examine these witnesses regarding the topics he sought to raise on recall at the time they were initially called. As the court noted, the purpose of recalling a witness is to address additional evidence that may have arisen since the witness was called or to examine discrepancies in a witness's testimony, neither of which applied here.

Moreover, the trial court acted within its discretion under Evidence Code section 352 to exclude marginally relevant testimony which

27

was likely to necessitate undue consumption of time. Defense counsel made an offer of proof regarding what he hoped to ask Tommy and Office Lamas on recall, and the court reasonably concluded these topics were not sufficiently significant to justify recalling them.

In light of our conclusion the trial court did not abuse its discretion in determining the proposed examinations would not have produced relevant evidence, we further conclude that the trial court's refusal to allow the additional examination did not violate Hernandez's constitutional right to confront adverse witnesses. (See *People v. Quartermain, supra,* 16 Cal.4th at pp. 623–624) ["notwithstanding the confrontation clause, a trial court may restrict" examination of witnesses on the grounds stated in Evidence Code section 352].)

With respect to defense counsel's request to recall mother, even if the trial court erred in disallowing questioning her about the alleged threesome with Hernandez and Tommy, any error was harmless beyond a reasonable doubt under *Watson* and *Chapman* given the substantial evidence of guilt.

## VI.

### THE VERDICT FORMS CORRECTLY STATED THE LAW

Hernandez argues the verdict forms misstated the law because they provided the jury the option of finding him either "guilty" or "not guilty," which had the effect of requiring the jury to find that he was factually innocent before it could find him not guilty of the charged crimes. He similarly claims the verdict forms for the aggravating factors also misstate the law because they provide the jury the option of finding the factors "true" or "not true." He contends the verdict forms therefore violated his due process

28

right not to be convicted except upon proof beyond a reasonable doubt under *In re Winship* (1970) 397 U.S. 358.

We note this issue is waived because defense counsel did not raise any objection at trial to the wording of the jury verdict forms. A defendant's failure to object to a verdict form when the court proposed to submit it or when the jury returned its finding forfeits the issue on appeal. (See *People v. Bolin* (1998) 18 Cal.4th 297, 330 [defendant forfeited claim of error related to verdict form that contained incorrect code section].)

Even if this issue were preserved on appeal, it is without merit. Hernandez fails to cite, and we have been unable to locate, any authority concluding that the standard verdict forms which provide the jury the option of finding a defendant "guilty" or "not guilty" violate a defendant's due process right to be convicted only upon proof beyond a reasonable doubt.

Moreover, any possible error was cured by the jury instructions. The trial court properly instructed the jury on presumption of innocence and reasonable doubt. The jury was instructed with CALCRIM No. 220, which states, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. [¶] . . . [¶] Unless the evidence proves the defendant guilty beyond a reasonable doubt, (he) (is) entitled to an acquittal and you must find (him) not guilty." Regarding the aggravating factors, the court instructed the jury with CALCRIM No. 3250, "The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." We presume the jury followed its instructions. (*Chhoun, supra*, 11 Cal.5th at p. 30.)

## DISPOSITION

The judgment is affirmed.


SANCHEZ, J.

WE CONCUR:


MOTOIKE, P. J.


SCOTT, J.